IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2013 Term

_____

No. 11-1445

_____

FILED

**November 21, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

RONALD C. DAVIS,
Defendant Below, Petitioner

_____

Appeal from the Circuit Court of Jackson County
The Honorable Thomas C. Evans III, Judge
Civil Action No. 10-F-89

AFFIRMED

_____

Submitted: October 2, 2013
Filed: November 21, 2013

Herbert L. Hively, Jr., Esq.                     Patrick Morrisey, Esq.
Charleston, West Virginia                        Attorney General
Kennand L. Skeen, II., Esq.                      Christopher S. Doddrill, Esq.
Ripley, West Virginia                            Assistant Attorney General
Counsel for the Petitioner                       Charleston, West Virginia
                                                 Counsel for the Respondent

The Opinion of the Court was delivered PER CURIAM.

SYLLABUS BY THE COURT

1.    "In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review." Syl. pt. 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).

2.    "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. pt. 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

3.    "A preliminary examination conducted pursuant to Rule 5.1 of the West Virginia Rules of Criminal Procedure serves to determine whether there is probable cause to believe that an offense has been committed and that the defendant committed it; the purpose of such an examination is not to provide the defendant with discovery of the nature of the State's case against the defendant, although discovery may be a by-product of the preliminary examination." Syl. pt. 1, *State v. Desper*, 173 W. Va. 494, 318 S.E.2d 437 (1984).

4. "In challenging probable cause at a preliminary examination conducted pursuant to Rule 5.1 of the West Virginia Rules of Criminal Procedure, a defendant has a right to cross-examine witnesses for the State and to introduce evidence; the defendant is not entitled during the preliminary examination to explore testimony solely for discovery purposes. The magistrate at the preliminary examination has discretion to limit such testimony to the probable cause issue, and the magistrate may properly require the defendant to explain the relevance to probable cause of the testimony the defendant seeks to elicit." Syl. pt. 2, *State v. Desper*, 173 W. Va. 494, 318 S.E.2d 437 (1984).

5. " ' " 'Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk*, 171 W.Va. 639 [643,] 301 S.E.2d 596, 599 (1983)." Syl. Pt. 2, *State v. Peyatt*, 173 W. Va. 317, 315 S.E.2d 574 (1983).' Syl. Pt. 1, *State v. Shrewsbury*, 213 W. Va. 327, 582 S.E.2d 774, 213 W. Va. 327 (2003)." Syl. pt. 1, *State v. Kaufman*, 227 W. Va. 537, 711 S.E.2d 607 (2011).

6. "When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore,

the circuit court's factual findings are reviewed for clear error." Syl. pt. 1, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

7.      "On appeal, legal conclusions made with regard to suppression determinations are reviewed *de novo*. Factual determinations upon which these legal conclusions are based are reviewed under the clearly erroneous standard. In addition, factual findings based, at least in part, on determinations of witness credibility are accorded great deference."  Syl. pt. 3, *State v. Stuart*, 192 W. Va. 428, 452 S.E.2d 886 (1994).

8.      "A trial court's determination of whether a custodial interrogation environment exists for purposes of giving Miranda warnings to a suspect is based upon whether a reasonable person in the suspect's position would have considered his or her freedom of action curtailed to a degree associated with a formal arrest."  Syl. pt. 1, *State v. Middleton*, 220 W. Va. 89, 640 S.E.2d 152 (2002), *overruled on other grounds by State v. Eilola*, 226 W. Va. 698, 704 S.E.2d 698 (2010).

9.      "The factors to be considered by the trial court in making a determination of whether a custodial interrogation environment exists, while not all-inclusive, include: the location and length of questioning; the nature of the questioning as it relates to the suspected offense; the number of police officers present; the use or absence of force or physical restraint by the police officers; the suspect's verbal and

nonverbal responses to the police officers; and the length of time between the questioning and formal arrest." Syl. pt. 1, *State v. Middleton*, 220 W. Va. 89, 640 S.E.2d 152 (2002), *overruled on other grounds by State v. Eilola*, 226 W. Va. 698, 704 S.E.2d 698 (2010).

10. "When the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either West Virginia Rule of Criminal Procedure 16 or case law; (2) whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach. In determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction." Syl. pt. 2, *State v. Osakalumi*, 194 W. Va. 758, 461 S.E.2d 504 (1995).

11. "When the government performs a complicated test on evidence that is important to the determination of guilty, and in doing so destroys the possibility of an independent replication of the test, the government must preserve as much documentation

iv

of the test as is reasonably possible to allow for a full and fair examination of the results by a defendant and his experts." Syl. pt. 4, *State v. Thomas*, 187 W. Va. 686, 421 S.E.2d 227 (1992).

12.     "A prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution."   Syl. pt. 4, *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982).

13.     "A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion."  Syl. pt. 4, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

14. "Instructions must be based upon the evidence and an instruction which is not supported by evidence should not be given." Syl. pt. 4, *State v. Collins*, 154 W. Va. 771, 180 S.E.2d 54 (1971).

15. "A trial court exercising appropriate judicial concern for the constitutional right to testify should seek to assure that a defendant's waiver is voluntary, knowing, and intelligent by advising the defendant outside the presence of the jury that he has a right to testify, that if he wants to testify then no one can prevent him from doing so, that if he testifies the prosecution will be allowed to cross-examine him. In connection with the privilege against self-incrimination, the defendant should also be advised that he has a right not to testify and that if he does not testify then the jury can be instructed about that right." Syl. pt. 7, *State v. Neuman*, 179 W. Va. 580, 371 S.E.2d 77 (1988).

Per Curiam:

Petitioner Ronald C. Davis appeals his jury conviction for first degree murder and first degree arson involving a fire that killed his girlfriend, Cathy Parsons ("Ms. Parsons"). He was sentenced to life imprisonment without the possibility for parole on the murder conviction and a determinate term of 20 years in prison for the arson conviction. After a careful review of the record submitted for review, the briefs of counsel, the arguments of counsel and the law on these matters, we affirm the conviction and sentence.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

On September 23, 2010, the mobile home in which Cathy Parsons and the petitioner lived was engulfed in flames. On the day of the fire Ms. Parsons' daughter, Eltina Harper, and son-in-law, Allen Michael Harper, who lived 15 to 25 feet from Ms. Parsons' residence, heard pounding, loud talk and a scream emanating from the neighboring mobile home. Mrs. Harper looked toward her mother's home and saw the petitioner bending over on the front porch, and then saw a ball of flame erupt above him. Mr. Harper ran outside to help after hearing the noises. He found the door to the burning mobile home barricaded and the windows blocked. Although the Harpers and others tried to get Ms. Parsons out of the burning mobile home, they were unsuccessful and Ms. Parsons perished in the blaze.

1

While the mobile home burned, the petitioner remained outside the home. At various times he was observed petting a dog, howling, barking, laughing and whittling. He made several statements to Ms. Parsons' family members, such as "she's burning," and "I burned her alive."

While the fire was actively burning, law enforcement officials arrived to investigate the scene. At the time of law enforcement's arrival, it was uncertain whether Ms. Parsons was in the home, and the officers sought information from the petitioner about her location. Lt. Christopher Metz performed a *Terry*[1] pat-down search of the petitioner, during which the police retrieved a lighter from the petitioner's pockets as well

---

[1] *Terry v. Ohio*, 292 U.S. 1 (1968). A *Terry* stop is an investigatory stop in which a person is not under arrest and where law enforcement may check the person for dangerous weaponry. In *Terry*, the Supreme Court held:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.

392 U.S. at 30–31.

as a pocketknife.  When questioned by Lt. Metz, the petitioner gave different answers to the question of what he knew about the fire.  He stated that Ms. Parsons was not inside the burning trailer.  He later said that he went in and rescued two children.  Another statement was that he rescued one child from the porch.  Yet another statement was that he was inside the trailer when the fire started and he ran outside to escape the blaze. Investigating officers noticed that the petitioner's hair was singed and that he had what appeared to be a burn hole in his pants.  After this initial questioning, the petitioner was read his *Miranda*[2] warnings and was questioned by Deputy Faber from the Sheriff's Department.  None of this questioning resulted in a confession by the petitioner; however, the answers given by the petitioner during the initial inquiries and the later formal questioning were often inconsistent with each other.

The fire was investigated by the State Fire Marshal's office.  At the conclusion of the investigation, the State Fire Marshal concluded that the fire had started on the front porch. The trailer was totally consumed by the fire, leaving only the steel frame and ashes.  Ms. Parsons' body was found beneath the ashen remains of her trailer. Medical testimony at trial showed that she was alive at the time the fire was burning; her cause of death was smoke inhalation and thermal burns.

Several days after the fire, the Harpers sought to return to their mobile home that was adjacent to the remains of Ms. Parsons' trailer.  Mike Harper requested

---

[2]  *Miranda v. Arizona*, 384 U.S. 436 (1966).

permission to clean up the fire scene because it was too difficult for his family to return to their home while debris from their mother/grandmother's death was still there. The State Fire Marshal released the fire scene to Mr. Harper, who then carried off the metal remains of the trailer for scrap and recycling. He buried the remainder of the fire debris.

During the seven-day trial of this case, the State presented 38 witnesses in support of its case. The petitioner's defense centered on Ms. Parsons' family members' motivations to harm her and the inadequacies of the fire investigation. The petitioner also presented testimony from two experts in fire investigation in an attempt to discredit the report and testimony of the State Fire Marshal's office. The petitioner testified on his own behalf, stating that he was in the trailer passed out when the fire started, and he had no idea of what happened or how the fire began. He testified that he did not try to rescue Ms. Parsons because he had a bad hand, but later testified that he attempted to re-enter the trailer and was then burned. He testified that while others were trying to rescue Ms. Parsons, he stayed near a truck because he was choking, drunk and about dead. He testified that he did not recall speaking to Lt. Metz or what he said to Deputy Faber. The jury returned a verdict of guilty on both counts. The jury did not recommend mercy on the murder conviction. The petitioner moved for a new trial, which was denied. The court sentenced the petitioner to life imprisonment, without the opportunity for parole, on the murder conviction and twenty years on the arson conviction. The sentences were set to run consecutively.

4

The petitioner timely appealed this order.

## II.

## STANDARD OF REVIEW

The petitioner asserts nine assignments of error. Our general standard of review is as follows:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review."

Syl. pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000). More specific standards for the review will be discussed separately as this Court addresses the assignments of error.

## III.

## DISCUSSION

### A. Constraints on the petitioner's questioning at the preliminary hearing.

The petitioner assigns as error in this proceeding that unreasonable constraints were placed upon the questioning and cross-examination of witnesses at the preliminary

5

hearing. He argues that he was denied the opportunity to confront witnesses against him and to the effective assistance of counsel.

The State called two witnesses at the preliminary hearing on October 4, 2010: the officer who participated in investigating the fire, Deputy Faber, and Allen Michael Harper, Ms. Parsons' son-in-law and next-door neighbor. During the testimony of Deputy Faber, the petitioner attempted to question why the fire scene had been razed. The State objected, and the magistrate sustained the objection. The petitioner continued to question Deputy Faber about the investigation, resulting in another objection by the State that the petitioner was attempting to delve into discovery rather than whether there was probable cause to send the case to the grand jury. Again, the magistrate sustained the objection. The petitioner called Assistant State Fire Marshal Jason Baltic as a witness during the preliminary hearing and attempted to delve into why the burned remains of Ms. Parsons' mobile home had been destroyed. Again, the State objected, and the magistrate sustained the objection. The petitioner also attempted to question Mr. Baltic about his investigation of the fire, which at the time was still on-going. The State objected to this line of questioning, arguing that the petitioner was again seeking discovery. The objection was sustained. The magistrate ultimately found that probable cause had been shown and bound the case over to the grand jury. On October 27, 2010, the grand jury indicted the petitioner on one count of first-degree murder and one count of arson.

6

At no time after the indictment did the petitioner raise this issue before the circuit court. The petitioner presents this issue for the first time in this appeal.[3]

Our standard of review for issues not properly preserved for appeal, or not presented to the trial court for resolution prior to an appeal, is plain error. There are four elements that must be shown to exist before plain error applies: "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. pt. 7, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

We do not find any error as it relates to the preliminary hearing. First and foremost, we see no error in the way that the preliminary hearing was conducted. The magistrate conducted the preliminary hearing with full recognition of its purpose: to determine whether there is probable cause that an offense was committed and that the petitioner committed it. W Va. R. Crim. P. 5.1. We have explained that the focus of a preliminary examination is to determine probable cause, not to conduct discovery. We have held that

> [a] preliminary examination conducted pursuant to
> Rule 5.1 of the West Virginia Rules of Criminal Procedure
> serves to determine whether there is probable cause to believe

---

[3] The petitioner sought a writ of prohibition before this Court on the issue of spoliation of evidence. This Court denied the petition for writ of by order entered August 26, 2011.

7

that an offense has been committed and that the defendant committed it; the purpose of such an examination is not to provide the defendant with discovery of the nature of the State's case against the defendant, although discovery may be a by-product of the preliminary examination.

Syl. pt. 1, *State v. Desper*, 173 W.Va. 494, 318 S.E.2d 437 (1984). Furthermore, we have held

> In challenging probable cause at a preliminary examination conducted pursuant to Rule 5.1 of the West Virginia Rules of Criminal Procedure, a defendant has a right to cross-examine witnesses for the State and to introduce evidence; the defendant is not entitled during the preliminary examination to explore testimony solely for discovery purposes. The magistrate at the preliminary examination has discretion to limit such testimony to the probable cause issue, and the magistrate may properly require the defendant to explain the relevance to probable cause of the testimony the defendant seeks to elicit.

Syl. pt 2, *Id.*

We find no reversible error in the magistrate's handling of the preliminary hearing.

## B. Refusal to strike a witness' testimony

For his next assignment of error, the petitioner argues that it was error for the circuit court to not strike the testimony of Alvin Turner. Our standard of review for these types of evidentiary questions is deferential. We have held that

> " " ' "[r]ulings on the admissibility of evidence are
> largely within a trial court's sound discretion and should not
> be disturbed unless there has been an abuse of discretion."
> *State v. Louk*, 171 W.Va. 639 [643,] 301 S.E.2d 596, 599
> (1983).' Syl. Pt. 2, *State v. Peyatt*, 173 W. Va. 317, 315
> S.E.2d 574 (1983)." Syl. Pt. 1, *State v. Shrewsbury*, 213 W.
> Va. 327, 582 S.E.2d 774, 213 W. Va. 327 (2003)."

Syl. pt. 1, *State v. Kaufman*, 227 W. Va. 537, 711 S.E.2d 607 (2011).

Alvin Turner and the petitioner were incarcerated at Huttonsville Correctional Center prior to the trailer burning. Several weeks before the petitioner's release from prison, and while in the recreation yard at the prison, Mr. Turner overheard the petitioner telling another inmate that he would "kill the bitch and burn her house down." No objection was made when this testimony was given. Petitioner's counsel cross-examined Mr. Turner about these statements and confirmed that the petitioner had not identified the woman the petitioner wanted to kill by name. It was only after this witness had been excused from the stand that the petitioner objected to this testimony, moving for a mistrial and to strike Mr. Turner's testimony, arguing that it was not clear to whom the petitioner was referring when he made these statements. The court denied the motion for mistrial and the motion to strike the witness' testimony, finding that the petitioner had not demonstrated manifest necessity for a mistrial. The court stated that the pre-trial statements of this witness had been given to the petitioner prior to the testimony at trial. The court found that Mr. Turner's testimony was consistent with his previous statements. Further, the court found that Mr. Turner's testimony was similar to that of

9

witness Christine Roth, who testified that while visiting the petitioner in prison in 2006,[4] she overheard him state that he would kill Ms. Parsons and burn her, because he believed that she was a witch.

This Court reviews the circuit court's decision to admit evidence for an abuse of discretion. There was no objection to this testimony at the time it was given, and that the motions for mistrial and to strike the witness' testimony were made after the witness had been excused.[5] The circuit court's refusal to grant a mistrial the motion and to strike the witness' testimony was within the court's discretion, and we see no abuse of this discretion.

## C. Failure to admit tape-recorded statements between the petitioner and Ms. Parsons

The petitioner next argues that it was reversible error for the trial court to not admit into evidence 20 tape recorded conversations between the petitioner and Ms. Parsons.[6] The purpose of these tape recordings was twofold: (1) to show that the petitioner and Ms. Parsons had a good relationship and (2) to impeach the testimony of

---

[4] The petitioner was married to Ms. Roth's mother.

[5] From our review of the record, it appears this objection was waived.

[6] These conversations were taped while the petitioner was serving a prison sentence for an unrelated crime.

Ms. Parsons' daughter and son-in-law by showing that they wanted Ms. Parsons' mobile home for themselves, and thus, had a motive for murdering her.[7]

The petitioner did play a recording of three calls for the jury. The recorded calls were difficult to hear and comprehend, leading one juror to request an aid to make the tape more understandable. Outside of the presence of the jury the petitioner was asked to find three more of the twenty calls that he wanted the jury to hear. He was directed by the court to show why any more than the three would be relevant to the defense, in light of the poor quality of the recordings and difficulty in discerning what was being said. The petitioner countered that he had six additional calls he wanted to play for the jury, along with transcripts of the calls. The circuit court initially denied the request, stating that these additional calls were not necessary and that the calls already played for the jury would serve the petitioner's stated purpose—to show that there was not an acrimonious relationship between the petitioner and Ms. Parsons and that these calls were relevant to the petitioner's theory that Ms. Parsons' daughter and son-in-law had a motivation for killing her. The circuit court ruled that this testimony was extrinsic evidence that was not admissible because it was hearsay. However, the petitioner's counsel announced to the court on the last day of testimony that he no longer wished to play the recordings of the six calls. Outside of the presence of the jury the petitioner's counsel announced, "I think we've changed our minds about playing it at this point."

___

[7] In his opening statement the petitioner put forth a theory that Ms. Parsons' daughter and son-in-law were motivated to kill Ms. Parsons.

11

Our standard of review regarding admission of evidence is deferential to the trial court's decisions, as noted in the previous assignment of error. In the present case, the petitioner clearly waived any opportunity to further play the six recorded calls. He now argues on appeal that the circuit court committed error when it would not allow all of the calls to be played. The State does not dispute that this type of evidence may be admissible, but contends that these calls were not sufficient evidence to assist a trier of fact in concluding that another person may have murdered Ms. Parsons. We agree. The circuit court chose not to allow the petitioner to play endless, unintelligible tape recordings of conversations between the petitioner and Ms. Parsons because they were (1) irrelevant and (2) out-of-court declarations of Ms. Parsons that were being introduced for the truth of the matter asserted, and were therefore, inadmissible hearsay. We find no error in the circuit court's analysis, rulings and conclusions on this ground or abuse of its discretion in not admitting the remainder of the calls into evidence.

### D. Failure to declare a mistrial after a witness' testimony was found to be incorrect

The petitioner asserts that it was error for the circuit court to deny a mistrial after the testimony of James Parsons was found to be incorrect. We review the circuit court's rulings on the admissibility of testimony for abuse of discretion.

12

Mr. Parsons testified at trial that he heard the petitioner tell Ms. Parsons' son-in-law, "I burned her alive." At the conclusion of this witness' direct testimony by the prosecutor, petitioner's counsel informed the court that Mr. Parsons' pre-trial statements did not contain this statement. The prosecutor then realized that an employee in his office who assisted in preparing this witness' trial testimony utilized a typewritten summary that did not have a verbatim summary of the witness' pre-trial statements. The witness needed assistance because he either could not read, or could not read well enough to review the written statement or written summary prepared by the prosecutor's office.

Outside of the presence of the jury, petitioner's counsel was allowed to question Mr. Parsons and make an evidentiary record on the issue. During this questioning, Mr. Parsons testified that he had not actually heard the petitioner make this statement, but had heard about the petitioner making this statement from other people. The employee of the prosecutor's office who assisted with witness preparation testified that she had prepared Mr. Parsons by reading his written statement to him. He corrected only one thing, changing the part where he stated that the petitioner said "she's burning alive" to "she's a-burning." Finally, Deputy Faber returned to the stand to testify that his notes taken during this witness' statement did not clarify whether Mr. Parsons was speaking about what he directly heard, or what he heard from other persons' accounts of events.

13

The court concluded that the witness preparation by the prosecutor's office was not suggestive and that no one had purposefully or accidentally suggested what Mr. Parsons should say at trial. The petitioner moved for a mistrial, which the court denied, finding that the petitioner had not shown a manifest necessity for the granting of a mistrial. The jury returned, and Mr. Parsons was questioned by petitioner's counsel whether he heard the petitioner tell Ms. Parsons' son-in-law that he burned Ms. Parsons alive. Mr. Parsons agreed that he did not hear that directly from the petitioner. At this point the court, without a request from the petitioner, instructed the jury as follows:

> Ladies and gentlemen of the jury, witnesses generally are only permitted to speak from or to testify from personal knowledge, all right? This witness has just indicated that what he told you this morning that he heard Ronnie say, "I burned her alive," he didn't actually hear that from Ronnie. He heard it from someone else, apparently. That means it is hearsay, which means it is inadmissible. It is not reliable. It is inadmissible. So the jury should disregard the statement, the testimony from this particular witness regarding what he heard Ronnie Davis say about "I burned her alive," all right?

The petitioner argues on appeal that a mistrial should have been granted, despite corrective action through the limiting instruction. The petitioner posits that there was no way to erase the prejudicial image of the petitioner making this statement with other evidence presented in the case.

The decision to declare a mistrial, discharge the jury and order a new trial in a criminal case is a matter within the sound discretion of the trial court. *State v. Craft*,

14

131 W.Va. 195, 47 S.E.2d 681 (1948). A trial court must exercise this discretion only when there is a "manifest necessity" for discharging the jury before it has rendered its verdict. W. Va. Code § 62-3-7 (1923).

We agree with the circuit court's conclusion that there was no manifest necessity to declare a mistrial. The petitioner has cited no authority that would lead to the conclusion that the court's actions were reversible error. Once defense counsel noticed the discrepancy between the witness' previous statement and his trial testimony, he alerted the court. He was allowed to make a record that included the testimony of the prosecutor's employee who assisted in preparing the witness for trial. The petitioner was allowed to cross-examine the witness on the discrepancies between the trial testimony and pre-trial statements, a typical focus of cross-examination of witnesses. Without a request by the petitioner, the court instructed the jury to disregard this testimony because the witness' testimony had to be from his personal knowledge, as opposed to something that someone else told him. The circuit court's determination that there was not a manifest necessity for a mistrial was not an abuse of its discretion and we find no error in the ruling.

### E. Suppression of the petitioner's statements

The petitioner next argues that it was error for the court to allow into evidence his statements to law enforcement that were given without *Miranda* warnings.

15

As noted herein, petitioner did not make a confession of guilt to law enforcement but did give a number of inconsistent statements that were used against him at trial.

> Our standard of review of this issue is as follow:
>
> When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

Syl. pt. 1, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

The petitioner argues that the statements given to Lt. Metz while the fire was actively burning and when law enforcement first arrived on the scene were the result of custodial interrogation, and therefore, *Miranda* applies. The petitioner further contends that the initial questions asked by Lt. Metz were part of a "two stage" interrogation procedure,[8] in which law enforcement obtains a confession before

---

[8] In *Missouri v. Seibert*, 542 U.S. 600, 604 (2004), the Supreme Court defined the two-step interrogation as follows, and rendering statements obtained in that fashion inadmissible:

> This case tests a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession. Although such a statement is generally inadmissible, since taken in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the interrogating officer follows it with *Miranda* warnings and then leads the suspect to cover the same ground a second time. The question here is

administering *Miranda* warnings and then administer *Miranda* warnings. The witness is then lead to cover the same ground a second time. The State objects to the characterization of Lt. Metz' questioning as "two stage," and contends that the petitioner's statements were properly admitted into evidence. In addition, the State asserts that the petitioner was not in custody at the time of these statements, and therefore, *Miranda* warnings were not required.

The circuit court held a hearing on the motion to suppress the petitioner's statements. The court found that the initial questions asked of the petitioner were not recorded and that they were of a distinctly general nature, similar to questions that would have been asked of any witness to a fire. The focus was on determining the location of Ms. Parsons, because her exact whereabouts were unknown at that time.

The circuit court further found that at the time of the questioning, the petitioner was not under arrest or in custody. While Lt. Metz testified that he would not have allowed the petitioner to leave the scene, the petitioner did not attempt to leave the

> the admissibility of the repeated statement. Because this midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda*'s constitutional requirement, we hold that a statement repeated after a warning in such circumstances is inadmissible.

Id., 542 U.S. at 604, 124 S.Ct. 2601, 2605, 159 L.Ed.2d 643, 650.

area, was not told that he could not leave the area and was not physically restrained until he was given *Miranda* warnings and gave a subsequent recorded statement.

The lower court concluded that the petitioner's answers to the preliminary questions, asked at the scene of a crime, in a non-custodial setting were not rendered inadmissible because of a failure to obtain a *Miranda* waiver. The court determined that the initial questioning was brief; the responses of the petitioner were largely self-serving and were not accompanied by any attempt on his part to leave the scene or terminate the questioning. The court concluded that the petitioner's answers were voluntarily given.

Our review of the circuit court's ruling regarding suppression of the petitioner's statements is as follows:

> On appeal, legal conclusions made with regard to suppression determinations are reviewed *de novo*. Factual determinations upon which these legal conclusions are based are reviewed under the clearly erroneous standard. In addition, factual findings based, at least in part, on determinations of witness credibility are accorded great deference.

Syl. pt. 3, *State v. Stuart*, 192 W. Va. 428, 452 S.E2d 886 (1994).

With that standard of review in mind, we find no clear error in the circuit court's factual determinations. When the officers arrived on the scene, they arrived to the chaos of a still-active fire, with first responders, distraught family and an intoxicated petitioner. Firefighters and law enforcement did not know where Ms. Parsons was. The

18

initial questioning of the petitioner was not part of a coordinated and continuing interrogation; the questions were of a broad and general nature concerning the facts and circumstances of the fire and the whereabouts of Ms. Parsons.

We likewise see no merit in the petitioner's assertions that this was part of a "two-stage" interrogation designed to circumvent the petitioner's *Miranda* rights. Again, the initial questioning was to aid in the general investigation of an on-going fire, not part of a targeted investigation.

Finally, there is no evidence that the petitioner was in custody at the time of the initial questioning, or that he should have perceived himself to be in custody at the time of the statements. We have held in that regard,

> A trial court's determination of whether a custodial interrogation environment exists for purposes of giving Miranda warnings to a suspect is based upon whether a reasonable person in the suspect's position would have considered his or her freedom of action curtailed to a degree associated with a formal arrest.

and

> The factors to be considered by the trial court in making a determination of whether a custodial interrogation environment exists, while not all-inclusive, include: the location and length of questioning; the nature of the questioning as it relates to the suspected offense; the number of police officers present; the use or absence of force or physical restraint by the police officers; the suspect's verbal and nonverbal responses to the police officers; and the

length of time between the questioning and formal arrest.

Syl. pts. 1 and 2, *State v. Middleton*, 220 W. Va. 89, 640 S.E.2d 152 (2006), *overruled on other grounds by State v. Eilola*, 226 W. Va. 698, 704 S.E.2d 698 (2010).

Applying these factors, we find that the questioning was brief and was not a custodial interrogation.  Lt. Metz was concerned with the whereabouts of Ms. Parsons who had not been located.  There was no evidence that the petitioner was not free to leave the scene.  The petitioner's verbal and non-verbal responses to the police officers gave no indication that he did not wish to answer the questions. Finally, the length of time between the initial inquiries of the petitioner and the formal statement to Deputy Faber was approximately twenty minutes.  The circuit court correctly ruled that the statements given to Lt. Metz by the petitioner were admissible.

### F.  Failure to dismiss the indictment because of spoliation of evidence

The petitioner has consistently argued since the initial arrest that these proceedings should have been dismissed because of spoliation of evidence.    The petitioner's contention is that the State or its agents, in the form of the Jackson County Sheriff's Department or the State Fire Marshal's office, should have never given permission to Ms. Parsons' family to raze the remains of the burned mobile home, leading to the spoliation and destruction of evidence crucial to the defense of these

20

charges. This argument overlooks the fact that the State's case did not rely in large part upon any forensic evidence obtained from the crime scene and that what evidence was used was available to the defense. The petitioner's spoliation theory centered on the theory that the State Fire Marshal's office should have taken soil samples to test for evidence of an accelerant and to otherwise preserve the scene for the petitioner's experts to examine. This contention was supported by the testimony of two fire experts retained by the defense.

The petitioner filed a motion to dismiss the indictment because of the spoliation of evidence. The circuit court held a pre-trial hearing on the motion and issued an order that contained findings of fact and conclusions of law. The circuit court found that the home of Ms. Parsons was 25 feet away from the home of Eltina Harper's family. After the fire, Ms. Parsons' daughter's family had to find temporary housing because it was too difficult to live near the charred remains of Ms. Parsons' trailer. The circuit court found that Harpers did not want to expose their children to the grim daily reminder of their grandmother's death.

The circuit court found that the Harpers sought permission from the Jackson County Sheriff's Department to clean up the charred remains of the mobile home. The Sheriff's Department then contacted the State Fire Marshal's office to seek permission to raze the scene. That permission was granted by the assistant fire marshal

investigating this case. The circuit court found that it was common practice for the fire marshal's office to release the fire scene soon after the fire investigation was completed.

The circuit court further found that there was no evidence of bad faith on the part of the Jackson County Sheriff's Department or the State Fire Marshal's office and that their actions were not taken to limit the petitioner's access to evidence.

The petitioner does not contend that there was error in these findings of fact but argues that the circuit court wrongly concluded that the facts of this case were controlled by our holding in *State v. Lanham*, 219 W. Va. 710, 639 S.E.2d 802 (2006), a case that addressed crime scene preservation. The petitioner posits that the case of *State v. Osakalumi*, 194 W. Va. 758, 461 S.E.2d 504 (1995), dealing with the ramifications of a specific piece of evidence being destroyed, should have guided the circuit court's decision.

In *Osakalumi*, we addressed the problem of destroyed evidence in a criminal case. The victim in *Osakalumi* was shot while seated on a couch. Petitioner Osakalumi's defense was that the victim died as a result of suicide. The couch on which the victim was seated at the time of her death had bloodstains on it and bullet holes through it, and investigating officers were able to extract a bullet, bone fragments and hair samples from the couch several days after the shooting. Officers were able to determine the trajectory of the bullets fired using the holes in the couch. Officers

eventually took the couch and stored it at the police station. The couch began emitting an unpleasant smell and permission was granted by the prosecuting attorney's office to dispose of the couch at the county landfill. Prior to disposing of the couch, law enforcement did not measure the couch, record or photograph the location of the bullet hole on the couch, or photograph the trajectory of the bullet.

At trial, the trajectory of the bullet fired became a crucial question for jury determination. Osakalumi presented a witness who was a forensic scientist and firearms experts who testified that the trajectory of a bullet could not be determined from a couch upon which people had sat, slept and played. Further, this witness testified that the bullet that was found may have moved from where it was originally lodged before this couch was later examined by the state police.

Osakalumi argued that his due process rights were violated when the trial court permitted the State to introduce evidence from the couch which the defendant was not allowed to examine. In reversing Osakalumi's conviction for murder and remanding the case for a new trial, we created new law on how trial courts should handle instances where evidence is destroyed. We held,

> When the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either West Virginia Rule of Criminal Procedure 16 or case law; (2)

23

whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach. In determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction.

Syl. pt. 2, *Osakalumi*, 194 W. Va. 758, 461 S.E.2d 504.

While *Osakalumi* addressed the loss or destruction of a specific piece of evidence, *State v. Lanham*, 219 W. Va. 710, 639 S.E.2d 802 (2006), dealt with the destruction of an entire crime scene. In *Lanham*, the mobile home in which the victim was killed was released to the family after bullet holes, blood stains, blood spatter and other damage related to the shooting were documented and photographed. The defendant in *Lanham* argued that the State had a duty to preserve the crime scene evidence so that he could review the same and that the State's failure to do so violated this Court's decision in *Osakalumi* and *State v. Thomas*, 187 W. Va. 686, 421 S.E.2d 227 (1992). In Syllabus point 4 of *Thomas,* we held

When the government performs a complicated test on evidence that is important to the determination of guilty, and in doing so destroys the possibility of an independent replication of the test, the government must preserve as much documentation of the test as is reasonably possible to allow for a full and fair examination of the results by a defendant and his experts.

*Thomas* also reiterated that "[a] prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution." Syl. pt. 3, *Thomas*, *quoting* syl. pt. 4, *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982).

In *Lanham*, the State did not rely upon a missing piece of evidence to convict the defendant. Unlike *Osakalumi*, the defendant in Lanham was not subjected to evidence of a scientific test that directly implicated him. Instead, the conviction was based upon eyewitness testimony, as well as duly documented crime scene photographs of blood spatter, blood stains, bullet holes and other evidence.

As did the circuit court, we find the petitioner's reliance upon our holding in *Osakalumi* misplaced. The case *sub judice* is almost identical to the *Lanham* case, in which the physical evidence from the scene was not the basis of the State's case. The State in the present case relied upon eyewitness testimony that placed the petitioner on the front porch of Ms. Parsons' home as the fire erupted, physical evidence from the petitioner's clothing and singed hair that indicated he had been near a fire, the inconsistent statements of the petitioner while the fire was burning, toxicological and pathological evidence from the body of Ms. Parsons, and threats made by the petitioner to harm Ms. Parsons.

25

The petitioner has long asserted that the investigation performed by the State Fire Marshal in this case was faulty, shoddy and incomplete. Through the testimony of his own fire experts, the petitioner attempted to cast doubt upon the State Fire Marshal's techniques, protocol and methodology. The petitioner made these arguments to the jury at trial. The jury was left to weigh the opinions of all fire experts and ultimately agreed, based upon the verdict, with the opinions of the State Fire Marshal. We find no error in the trial court's findings and conclusions relating to the spoliation of evidence.

### G. Failure to give an *Osakalumi* instruction to the jury

The petitioner argues that it was error for the circuit court to not give an instruction based upon *Osakalulmi*. The petitioner failed to request any instruction at trial and on appeal argues that the jury should have been given a cautionary instruction "that was similar to that in *Osakalumi*."

Our standard for review of whether a jury has been properly instructed is deferential as to form. We have held that

> [a] trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge

accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

Syl. pt. 4, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

We are also mindful that the jury instruction must be based upon the evidence in the case. "Instructions must be based upon the evidence and an instruction which is not supported by evidence should not be given." Syl. pt. 4, *State v. Collins*, 154 W. Va. 771, 180 S.E.2d 54 (1971).

Because no instruction was requested, our standard of review is for plain error. We have discussed *supra* the application of the plain error doctrine. In this instance, there was no plain error in failing to give an instruction about destroyed evidence because we have already determined there was no error in the court's ruling on spoliation of evidence. Therefore, there can be no error in not giving an instruction that was not supported by our law.

### H. The petitioner's decision to testify on his own behalf

As his final assignment of error, the petitioner asserts that he was coerced by the trial court into making a hasty decision about whether he would testify on his own behalf. Our review of the trial court's manner of conducting the trial is for an abuse of discretion, having recognized that "a trial judge has broad discretion in managing his or

27

her docket, including trial procedure and the conduct of trial." *Barlow v. Hester Industries, Inc.*, 198 W. Va. 118, 127, 479 S.E.2d 628, 637 (1996).

The petitioner asserts that he was prejudiced when, on the second-to-last day of testimony, he was prematurely forced to choose whether he wanted to testify. The petitioner's last witness (other than himself) was unable to travel to Jackson County until the next day. The petitioner moved to continue the trial until the next day, so that the witness could testify before he himself took the stand. While that motion was pending, the court, the petitioner and his lawyer engaged in the following discussion:

> THE COURT:    Okay. Ronnie, your lawyers—you just heard them—indicated that they're going to —they want to call an expert witness on the gasoline issue, and then they're done, according to what they're telling me. By that, that is an indication that the defense is not going to present your testimony during this trial.  Have you decided to stay off the stand and exercise your right to remain silent?
> PETITIONER:    Not at this time, your Honor.  I would like to see what the expert says about the – the—supposed to be –
> THE COURT:    I can't hardly hear you, Ronnie.
> PETITIONER:    Uh –
> THE COURT:    Can you stand up?  Your lawyer can stand up with you.
> PETITIONER:    Not at this time. I just want to see what the expert has to say about the —what's  supposed  to  be  the gasoline on my shoe.
>     THE COURT:    Well, here's how it works:  You need to decide right now whether you are going to testify or not, because if you are going to testify, we're going to proceed with your testimony; if you're not, we're going to take up the question of whether the trial ends right now. So have you talked to your lawyers about whether you should testify or remain silent?
> PETITIONER:    Yeah, I'll testify.

28

THE COURT: You want to testify?
PETITIONER: Yeah.

The court then continued to question the petitioner about his decision. He instructed the petitioner that he had a right to remain silent, a fact the petitioner acknowledged. The court then told the petitioner that the jury would be instructed that it was the petitioner's choice whether to testify or to remain silent and that they may not find the petitioner guilty based in whole or in part on his silence. The court then told the petitioner that if he chose to testify, then the jury would be instructed that he was a competent witness to testify on his own behalf that they could not reject his testimony simply because he was on trial and charged with the crime set forth in the indictment. The court continued to discuss the types of instructions that would be given to the jury regarding how to weigh the petitioner's testimony.

The court then asked the petitioner whether he wanted to confer with his attorney prior to making the final decision regarding his testimony. A recess was taken after which the court again told the petitioner about the instructions that would be given the jury, the fact that he would be cross-examined by the State and other particulars about what faced a defendant who testified on his own behalf.

The court asked again what the petitioner's decision was. At this point counsel for the petitioner stated that one of the factors in the petitioner's decision to testify was his wanting the delayed fire expert to testify prior to the petitioner's

29

testimony.  The court indicated that it was leaning toward granting the continuance to allow the witness to appear, but that the petitioner would need to testify on this day, not wait until after the fire expert testified.

The petitioner then decided to testify, but after further discussion with the court, decided not to testify.  He then changed his mind again, indicating that he wanted to testify in this proceeding and that his attorneys had advised him to remain silent.

The petitioner asserts that the court, in forcing the petitioner to decide whether he was going to testify before he knew precisely what his fire expert was going to say, was not fair and warranted a new trial.  The State disagrees, arguing that there was no coercion on the part of the court affecting the petitioner's decision.  The State also argues that the fire expert's testimony was extremely short and limited, and acted as a rebuttal to a State witness who testified that the petitioner's shoe had traces of gasoline on it.  The expert's testimony had no effect on the petitioner's testimony.

In addition, the State argues that the colloquy with the petitioner was in conformance with syllabus point 7 of *State v. Neuman*, 179 W. Va. 580, 371 S.E.2d 77 (1988), in which we held

> A trial court exercising appropriate judicial concern for the constitutional right to testify should seek to assure that a defendant's waiver is voluntary, knowing, and intelligent by

30

advising the defendant outside the presence of the jury that he has a right to testify, that if he wants to testify then no one can prevent him from doing so, that if he testifies the prosecution will be allowed to cross-examine him. In connection with the privilege against self-incrimination, the defendant should also be advised that he has a right not to testify and that if he does not testify then the jury can be instructed about that right.

We believe that the petitioner was appropriately advised and cautioned by the trial court regarding the procedure and ramifications of testifying on his own behalf. Likewise, we do not find that the court's actions were prejudicial or the petitioner had to do anything he did not choose to do. We see no error in the trial court's actions.

## IV.

## CONCLUSION

For the foregoing reasons, the judgment of the Circuit Court of Jackson County is affirmed.

Affirmed.