**UNITED STATES of America, Appellee,**

v.

**Billy Gene WILSON, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Larry Dean MEAD, Appellant.**

**Nos. 73–1716, 73–1748.**

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1974.

Decided May 29, 1974.

Rehearing and Rehearing En Banc Denied June 21, 1974.

---

Thomas O. Baker, Kansas City, Mo., for Billy Gene Wilson.

Robert G. Duncan, Kansas City, Mo., for Larry Dean Mead.

J. Whitfield Moody, Asst. U. S. Atty., Kansas City, Mo., for appellee.

Before GIBSON, BRIGHT and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

Defendant-appellant Billy Gene Wilson appeals from a jury conviction on Counts I, II, XVI, XVII and XVIII of a 21-count indictment. Defendant-appellant Larry Dean Mead appeals from a jury conviction on Count I of the same indictment. Count I charged a violation of 18 U.S.C. § 371, that from prior to August, 1972, until or about December 1, 1972, appellants, together with John Dwain Dugger, Roy McMahan, John Butkovich, Clyde Boucher, Charles Couch, Ray Stockdale, Gerry L. Wilson and John Chester, named as defendants and co-conspirators, and James Hard-

grove, named as a co-conspirator but not a defendant, knowingly conspired to make, forge and counterfeit obligations of the United States. 18 U.S.C. §§ 471, 472 and 473. Count II charged appellant Wilson with causing certain counterfeit obligations to be sold, transferred or delivered in violation of 18 U.S.C. § 473. Counts XVI, XVII and XVIII charged appellant Wilson with making and causing to be counterfeited certain obligations of the United States in violation of 18 U.S.C. § 471.[1]

On August 31, 1973, appellant Wilson was sentenced to custody for a period of five years upon Count I and ten years upon Count II to be served concurrently, and fifteen years upon Counts XVI, XVII and XVIII, each to be served concurrently but consecutive to the sentences in Counts I and II, for a total of twenty-five years. On the same date, appellant Mead was sentenced to custody for eighteen months upon Count I.

## I.

Appellants initially contend that they were prejudiced and denied a fair trial because the indictment charged and the court submitted to the jury multiple conspiracies as a single conspiracy.[2] Kotteakos v. United States, 328 U.S. 750, 766–777, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). We disagree.

Whether a scheme is on conspiracy or several is primarily a jury question, since it is a question of fact as to the nature of the agreement. Koolish v. United States, 340 F.2d 513, 526 (8th Cir. 1965); United States v. Crosby, 294 F.2d 928, 945 (2nd Cir. 1961). The record, totalling over one thousand pages, establishes that the successive stages and the relationships between and among the co-conspirators constituted

1. Prior to trial, held February 5, 1973, all defendants except appellants and defendants McMahan and Butkovich pled guilt. McMahan was acquitted and Butkovich, although convicted, has not yet appealed.

2. Appellants argue that Count I charged at least three separate conspiracies: that the

initial conspiracy involved the disposition of $16,000.00 in counterfeit bills delivered by appellant Wilson to co-conspirator Dugger, and that separate conspiracies occurred with the subsequent printing of different counterfeit bills in ten- and twenty-dollar denominations.

the various phases of one basic and overriding plan.[3] *See,* Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *accord,* United States v. Simone, 495 F.2d 752 (8th Cir., filed April 29, 1974). Beginning on or prior to August, 1972, and continuing until on or about December 1, 1972, appellant Wilson engaged in the printing of counterfeit bills which were introduced into evidence. Wilson initially delivered approximately $16,000.00 in counterfeit twenty-dollar federal reserve notes to co-conspirator Dugger for the purpose of finding outlets for the bogus money. These notes were in turn distributed by Dugger and co-conspirator Hardgrove to other named co-conspirators. Printing and circulation were thereafter repeated in different denominations between and among the co-conspirators. The record discloses that appellant Mead joined the conspiracy with full knowledge of the enterprise when he agreed to take $15,000.00 in counterfeit bills from Dugger and further agreed to provide a building, which he purportedly owned, in which to "run" the counterfeiting. Mead also participated in the production of the bills by assisting in the "tinting" process, and by ultimately helping Wilson dismantle the printing plant. Although others joined in the illegal activities at various times, this did not interrupt or terminate the original conspiracy. One joins in the conspiracy charged with the same responsibility if he had been one of the instigators, and the mere fact that all of the members did not know the other members does not change this situation. Koolish v. United States, *supra,* 340 F.2d 513, 523–525 (8th Cir. 1965).

In any event, the evidence with respect to appellant Wilson's role as the sole printer throughout the entire scheme would have been the same whether one or multiple conspiracies were submitted and *a priori* would have implicated him in each conspiracy he alleges.[4] Similarly, with respect to appellant Mead, no attempt was made by the prosecution to connect him with the conspiracy on the basis of prior activities of the co-conspirators. His connection with the conspiracy was established solely by his own actions following his willful and knowing association with the conspiracy.

## II.

Appellant Wilson also assigns error in that his Fifth Amendment right of due process was violated by the participation in the prosecution of this matter of assistant United States Attorney J. Whitfield Moody, who by court appointment in July, 1966, represented Wilson in federal district court for the western district of Missouri,[5] when he

---

3. Moreover, the matter of submitting the issue of whether there was more than one conspiracy was discussed between the attorneys and the court in chambers. However, counsel for appellants did not request such an instruction and made no specific objection to the instruction on conspiracy which was given. *See,* Record at 856–73.

4. We note that Wilson was sentenced to five years upon Count I (conspiracy) and ten years upon Count II (selling and delivering counterfeit notes), to be served concurrently. Under the concurrent sentence doctrine, the affirmance of the conviction under Count II supports the sentence of ten years regardless of whether Wilson has a valid defense to the Count I conspiracy charge. The evidence supporting conviction under both counts was strong. United States v. Simone, *supra,* 495 F.2d 752, (8th Cir., filed April 29, 1974); United States v. Irby, 480 F.2d

1101, 1102 (8th Cir. 1973); Kilcrease v. United States, 457 F.2d 1328, 1331 (8th Cir. 1972); *compare,* Greene v. United States, 358 U.S. 326, 329–330, 79 S.Ct. 340, 3 L.Ed. 2d 340 (1959). We find no reason in this case why the concurrent sentence doctrine should not apply. *See,* United States v. Simone, *supra,* 495 F.2d 752, (8th Cir., filed April 29, 1974); United States v. Irby, *supra,* 480 F.2d 1101, 1102 (8th Cir. 1973); *see also* Benton v. Maryland, 395 U.S. 784, 789–790, 89 S.Ct. 2056, 2059–2060, 23 L.Ed. 2d 707 (1969).

5. Mr. Moody was the executive director of the Legal Aid Society and Defender Society of Greater Kansas City for three years from 1965 to 1968. This organization, sponsored by the Kansas City Bar Association, and financed by various sources, provided legal services to indigent persons in both criminal and civil matters. It was brought to the

was charged with possession of counterfeit notes. He further asserts that such participation in the instant case was violative of Canons 4, 5 and 9 of the Code of Professional Responsibility. Appellant Wilson's contention, initially raised upon his motion for new trial, is bottomed upon the assumption that because of the alleged knowledge on the part of the prosecution of Wilson's prior counterfeiting activities, the investigation against Wilson was prejudicially more effective.[6] We note at the outset that because of this argument being made in support of Wilson's motion for new trial, the trial court ordered the entire Secret Service file of this investigation to be filed with the court *in camera.* After its examination of the file, the court stated in its order denying appellant Wilson's motion:

> Not only does the file not disclose any participation of Mr. Moody in the investigation of the case, all of the evidence clearly indicates that no one connected with the investigation knew the identity of the man who was printing the money until the elaborate trap laid by the government was sprung and Mr. Wilson was taken into custody.

Our independent examination of the *in camera* materials indicates that the trial court was correct. It discloses that an informant cooperated with Secret Service agents in Kansas City. He identified a photograph of appellant Wilson as the printer of the bills in issue, and disclosed the location of the counterfeiting plant owned by appellant Mead. Following this information, on December 1, 1972, appellant Wilson was arrested. Wilson made no statement to Secret Service agents following his arrest, and all government information in connection with the operation resulted from information given and leads furnished by informants. Corroborating evidence obtained thereafter came from the cooperating evidence obtained thereafter came from the cooperation of co-conspirator Dugger—not from knowledge allegedly previously obtained from Wilson. There was absolutely no relationship between the former representation by Moody and the present criminal prosecution.

Certainly, it is worth noting that appellant Wilson sat face to face with Mr. Moody during the entire trial, which lasted over an entire week. Nevertheless, it was not until after the guilty verdict was returned that Wilson recognized the attorney in whom, some six years prior, he had allegedly confided his modus operandi.

Our examination of this record convinces us that appellant Wilson has not been prejudiced by Mr. Moody's participation in the prosecution of this matter, nor in this connection has Mr. Moody violated the Code of Professional Responsibility. *Cf.,* Gajewski v. United States, 321 F.2d 261, 267–268 (8th Cir. 1963); Autry v. Tennessee, 1 Tenn.Cr.App. 95, 430 S.W.2d 808, 809 (1967); *see also,* Annot., 31 A.L.R.3d 953 § 4(b) (1970).

### III.

■■ Additionally, appellants allege that they were denied a fair trial because of the introduction in evidence of numerous instances of other crimes. They argue that certain comments were made by the prosecution in its opening statement and by various witnesses alluding to circumstances which may have been outside the scope of the charges alleged in the indictment, and that they

---

court's attention during oral argument of this cause that during Mr. Moody's tenure as executive director, he represented at least 90% of those defendants represented by the society in federal court. It was estimated that this number totalled over 300 individual defendants.

6. Appellant Wilson's affidavit attached to his motion for a new trial alleges that he discussed in detail with Mr. Moody, as his attorney, certain matters which he considered unique to his counterfeiting operation. In the instant cause, appellant Wilson was accused of being the printer of the counterfeit bills, whereas he had previously been accused of possession only.

were thereby prejudiced.[7] We are satisfied upon this record that no such prejudice has been shown. Appellants' con-

victions are therefore affirmed in all respects.

Affirmed.

7. Certain of the allegedly prejudicial references were made in connection with Count XXI of the indictment which related solely to appellant Wilson, and upon which Wilson was found not guilty. Appellants also complain with respect to the admission of certain hearsay statements made between co-conspirators Wilson and Dugger during the course of the conspiracy. Such statements are admissible. *See, e. g.*'s, United States v. Richardson, 477 F.2d 1280 (8th Cir. 1973) ; United States v. Schroeder, 433 F.2d 846 (8th Cir. 1970). Other instances of the admission of allegedly prejudicial testimony urged by appellants include testimony of co-conspirator Hardgrove that threats were made against him by co-conspirator McMahan (introduced solely against the latter who was acquitted) ; testimony of co-conspirator Gerry L. Wilson, relating alleged threats against him by co-conspirator Dugger (the majority of which was elicited upon cross-examination by counsel for appellant Wilson) ; testimony in connection with the uttering of counterfeit bills in other states ; and testimony concerning the possession of blank counterfeit Missouri drivers' licenses. Regarding this latter point, the testimony was properly admitted as corroborative evidence of the overall conspiracy. Hanger v. United States, 398 F.2d 91, 102 (8th Cir. 1968) ; Williams v. United States, 272 F.2d 40, 41–43 (8th Cir. 1960) ; Tinkle v. United States, 254 F.2d 23, 29–30 (8th Cir. 1958) ; 3 Orfield, Criminal Procedure under the Federal Rules, § 26:506 (1966). Nonetheless, the trial court properly instructed the jury that appellants were not charged with counterfeiting the Missouri licenses, and no other requests were made by counsel at the time this testimony was admitted. Appellants also claim that the trial court made no effort to explain the absence of other counts in the indictment which were not then on trial. This contention is frivolous.